UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROWMOND BROWN,

               Petitioner,

    v.

R. GROUNDS,

               Respondent.

Case No.  12-cv-01714-WHO (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

     Petitioner Rowmond Brown seeks federal habeas relief from his state convictions because (1) the admission of his confession violated his right to due process; (2) the admission of evidence that the defendants passed a gun between them violated his right to due process; (3) the trial court violated his right to due process by redacting his statements; (4) the admission of evidence of an uncharged prior homicide violated his right to due process; (5) the peremptory challenges of African-American prospective jurors violated his rights to due process and to the equal protection of the law; (6) the prosecution violated his right to due process by allowing its key witness to commit perjury; and (7) the trial court's failure to give guidance to the jury during deliberations in response to a jury question violated his right to due process.  None of these claims has merit and, for the reasons set forth below, the petition for such relief is DENIED.

**BACKGROUND**

     In 2007, an Alameda County Superior Court jury found petitioner Brown, along with co-defendants Delvond Brown (petitioner's brother), Erick Ray Richardson, and Robert Rubio, guilty of the first degree murder of Thomas Anderson, who was felled

by gunfire on September 2, 2003.  Brown received a sentence of 26 years-to-life in state prison.  (Ans., Ex. L at 1–2 (State Appellate Opinion, *People v. Brown, et al.*, No. A118569, 2011 WL 1197465 (Cal. Ct. App. Mar. 30, 2011) (unpublished)).)  He sought to overturn his conviction through the state courts, but was unsuccessful.[1]  This federal habeas petition followed.

Evidence presented at trial showed that Brown and his co-defendants were involved in the shooting death of Anderson.  The jury determined that Richardson alone was the shooter, while Brown drove the vehicle from which Richardson emerged to perpetrate the crime.  (Ans., Ex. L at 6.)

Another man, Michael Thompson, was shot the same day as Anderson.  Bullets and casings from the Thompson murder matched those used in the Anderson killing.  (Ans., Ex. L at 7.)  Brown admitted to police that he was present at the Thompson shooting. Though the defendants were not charged with Thompson's murder, the prosecution presented evidence of the crime at trial.

Brown was interrogated by police regarding Anderson's murder.  The state appellate court summarized the relevant details as follows:

> On the evening of November 5, 2003, after being arrested, [Brown] was advised of his *Miranda* rights . . . and was interviewed by Sergeants Ferguson and Galindo.  FN14.  He acknowledged having driven in his turquoise car down 48th Avenue, zigzagging and showing off, then making a U-turn at 50th Avenue, and sideswiping a lady.
>
> FN14. As we will discuss in detail below, the statements of both [Brown] and Delvond Brown were redacted before the jury heard them . . . This summary of their statements is drawn from the redacted versions heard by the jury.
>
> In a taped statement made shortly after midnight on November 6, 2003, [Brown] was again advised of his *Miranda* rights.  He said he had seen Anderson earlier on the day he was killed, with "Ante" and some females. He picked up his turquoise car from a detail shop around 4:00 p.m. or 5:00

---

[1] The state appellate court ordered the correction of the abstract of judgment so that it would accurately convey the sentences imposed by the trial court.  (Ans., Ex. L at 57.)

p.m. He went to 48th Avenue and Vicksburg to buy some marijuana, driving in a zigzag manner. He made a U-turn, and hit a woman's car. He heard multiple gunshots, and learned later in the day that Anderson had been killed.

At approximately 9:00 a.m. on November 6, 2003, [Brown] made another taped statement. He said that on the evening of September 3, he was visiting a friend, and another friend, "Kev," pulled up in a white Nissan Maxima station wagon. [Brown] asked him what had happened on 90th Avenue, and Kev said, it got "real ugly."

[Brown] made another taped statement at approximately 11:30 a.m. the same morning. In it, he acknowledged being in the rear of the Nissan station wagon when Thompson was shot at 90th and Bancroft. He said Kev was driving the car. He saw a burgundy car being shot at before driving away. He heard someone saying, "[T]here you go right there," and shots went off, but he did not know who said it. It could have been Kevin. He thought Kevin was shooting a gun, and he was pretty sure of that because "[i]t was two different shots." Afterwards, they went to a detail shop, got into [Brown]'s car, and went to "four eight" to buy marijuana. He also said he did not know why the shooting happened, and that he did not want it to happen.

(Ans., Ex. L at 7–8.)

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state-court decision is objectively reasonable. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This "[i]ndependent review . . . is not *de novo* review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

## DISCUSSION

### I.    Admission of Statements to Police

Brown claims that because his statements to police were coerced their admission at trial violated his right to due process. The state appellate court summarized the relevant facts as follows:

United States District Court
Northern District of California

[Brown] was arrested at 9:48 a.m. and placed alone in an interview room at 4:08 p.m. He spent the intervening time in an apartment and handcuffed in the back of a police vehicle.  There was no indication that he was given food or restroom breaks during that time.

The interview room where [Brown] was placed that afternoon was approximately eight by ten feet, and had no windows. It had a table and three chairs.  When [Brown] knocked on the door and asked to use the restroom at 4:55 p.m., two officers took him there.  He was given a cheeseburger, fries, and water at 5:03 p.m., and had another restroom break at 5:47 p.m.  Sergeants Ferguson and Galindo entered the room to interview him at 7:30 p.m.  After obtaining identifying information, Ferguson advised [Brown] of his *Miranda* rights, and [Brown] said he understood them. When asked if he wished to talk to the officers, he said, "Yeah.  Just get this over with."  After some time, Ferguson showed [Brown] a warrant for his arrest for murder.  [Brown] said he had been present when Anderson was shot, and asked for some time alone before talking. Ferguson and Galindo left the room at 10:53 p.m. and returned half an hour later. [Brown] had another restroom break.  Ferguson and Galindo then interviewed him and took a taped statement, which began at 12:16 a.m. They left the interview room at 12:37 a.m.  At the time, [Brown] was offered water, food, and a restroom break, and he refused.  Ferguson testified that except for the time he saw the arrest warrant, [Brown] seemed composed when he answered questions.  [Brown] remained in the room until almost noon on November 6, 2003.  According to Ferguson, people could lie down and rest either on the floor or table of the interview room, and the lights could be turned off.

Sergeants Cruz and Dunakin, who were investigating the Thompson killing, went to the interview room at 12:58 a.m. on November 6.  The interview lasted until 3:00 a.m., and [Brown] said he did not know anything about the shooting on 90th Avenue.  [Brown] was taken for restroom breaks at 4:58 a.m. and 7:47 a.m.  After the 7:47 a.m. break, he asked to speak with Sergeant Phil Green, who had investigated the homicide case in which [Brown] had previously testified.  Green went into the interview room at 8:00 a.m., and [Brown] told him the other investigators — Sergeants Cruz and Dunakin, who were investigating the shooting at 90th Avenue — were "coming at him wrong" and "crossing him up."  Green told [Brown] the shootings at 48th Avenue and 90th Avenue had been committed by the same people, told him (untruthfully) that he had been identified at 90th Avenue, and said that he needed to tell his version of what had happened. [Brown] said he would talk if Green was present.  [Brown] was concerned about someone who was in the interview room next to his, and at his request, he was moved to another interview room, which was larger and had windows.   Green and Cruz interviewed him, then took a taped

5

statement.  [Brown] did not tell Green he was tired.  Green and Cruz left
the room at 9:24 a.m.  [Brown] had another restroom break at 10:49 a.m.,
and Cruz and Dunakin returned to interview [Brown] at 11:18 a.m.  Cruz
told [Brown] he had spoken with Delvond Brown, who had told him
[Brown] had been in the car at 90th Avenue and Bancroft.  [Brown] gave a
taped statement beginning at 11:27 a.m.

(Ans., Ex. L at 38–39.)  The trial court concluded that the statements were not coerced, and
admitted them.  The state appellate court affirmed this decision:

Considering all of these factors, we reject [Brown]'s contentions.  We
recognize that a significant period of time elapsed between [Brown]'s arrest
and the time he was questioned.  However, during the time [Brown] was in
the interview room he had regular restroom breaks, he was given food once,
he refused another offer of food, and he was free to rest during the time he
was alone.  In the circumstances, we cannot agree with [Brown] that his
statements were the result of coercive police activity.  We therefore discern
no error in the trial court's ruling that the statements were made voluntarily.

(*Id.* at 40.)

Involuntary confessions in state criminal cases are inadmissible under the
Fourteenth Amendment.  *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960).  A court on
direct review is required to determine, in light of the totality of the circumstances,
"whether a confession [was] made freely, voluntarily and without compulsion or
inducement of any sort."  *Withrow v. Williams*, 507 U.S. 680, 689 (1993) (internal
quotation marks and citation omitted).  A federal habeas court must review de novo the
state court's finding that a confession was voluntarily given.  *U.S. v. Preston*, 751 F.3d
1008, 1020 (9th Cir. 2014).  A state court's subsidiary factual conclusions, however, are
entitled to the presumption of correctness.  *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir.
1996) (deferring to state appellate court's conclusion that challenged statement did not
constitute threat or promise).

"[C]oercive police activity is a necessary predicate to the finding that a confession
is not 'voluntary' within the meaning of the Due Process Clause."  *Colorado v. Connelly*,
479 U.S. 157, 167 (1986).  The interrogation techniques of the officer must be "the kind of

1   misbehavior that so shocks the sensibilities of civilized society as to warrant a federal

2   intrusion into the criminal processes of the States." *Moran v. Burbine*, 475 U.S. 412, 433–

3   34 (1986).  The pivotal question in cases involving psychological coercion "is whether[, in

4   light of the totality of the circumstances,] the defendant's will was overborne when the

5   defendant confessed." *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993).

6         Habeas relief is not warranted here.  The state court reasonably determined that

7   Brown's statements were not coerced.  Nothing in the record shows that he was

8   psychologically coerced, and certainly nothing shows misbehavior that "shocks the

9   sensibilities of civilized society." *Burbine*, 475 U.S. at 433–34.  He did have to wait

10   almost ten hours from his arrest to the initiation of his questioning.  But many efforts were

11   made to make Brown comfortable and to put him at ease.  During his interviews, he

12   requested, was offered and was given bathroom breaks, food, and rather lengthy breaks

13   from the interrogation.  His requests to change interview rooms, to speak to an officer he

14   apparently trusted (Green), and to have that officer present during questioning were also

15   granted.  Regarding the time prior to the interrogations, there is nothing in the record to

16   show that anyone offered Brown food or bathroom breaks, yet there is nothing to show that

17   such offers were not made or that Brown requested anything, or that any requests were

18   denied.  Also, Brown had been subjected to police interrogation before and understood his

19   *Miranda* rights.  That he was clear-headed enough to ask for a policeman he trusted and

20   requested to change interview rooms is evidence of a person able to understand his rights

21   and act on this knowledge, not a person broken by coercive activities.  Considering all the

22   circumstances, the state appellate court's determination was reasonable and is entitled to

23   AEDPA deference.  The claim is DENIED.

24   **II.**      **Admission of Propensity Evidence**

25         At trial, Nikita Ragan, a prosecution witness, testified that, on different occasions

26   prior to the murder, she had seen Brown (1) passing a gun among his friends; (2) holding a

27   gun; and (3) handing a gun "to somebody."  She also testified that he owned a gun with a

28   clip.  (Ans., Ex. L at 12.)  Brown claims that this testimony constituted impermissible

United States District Court
Northern District of California

character or propensity evidence, the admission of which violated his right to due process. The state appellate court rejected this claim on state law grounds.  (*Id.* at 46–47.)

Habeas relief is not warranted here because no remediable constitutional violation occurred.  A federal habeas petitioner's due process right concerning the admission of propensity evidence is not clearly established for purposes of review under AEDPA, the Supreme Court having reserved this as an open question.  *Alberni v. McDaniel*, 458 F.3d 860, 866–67 (9th Cir. 2006).  His related contention that the prejudicial effect of the evidence outweighed its probative value also fails.  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  This claim is DENIED.

**III.    Admission of Redacted Statements**

Brown claims that the admission of his redacted statements violated his right to due process.  The state appellate court's analysis of this claim and its grounds for rejecting it are as follows:

> [Brown] points out additional redactions to his own statements that he contends prejudiced him by eroding his defense that he did not know the others in the car had guns or that there was going to be a shooting.  These redactions, according to [Brown], include the omission of his statements that there was someone in the front passenger seat and three people in the back seat of the car when Anderson was shot; that he did not plan to meet his friends at the detail shop; that he did not hear an argument with Anderson and Dickerson after his passengers got out of the car at 48th Avenue or that he stayed in the car; that the group talked about getting some marijuana at 48th Avenue; that he thought his friends were getting out of the car to get marijuana; that he did not know they had guns; that he thought the guns were left in the car after the Thompson shooting; and that the others would not tell him much about what happened because he had a history of testifying for the prosecution.
>
> We have reviewed [Brown]'s statements, and we conclude the redactions do not distort them as he contends.  The jury heard he "had serious problems" with talking about his friends, and that the officers had told him they "would respect . . . [his] wishes in that regard."  The prosecution's theory was not that [Brown] was one of the gunmen, but that he was

driving the car.  The jury heard [Brown] say he just "heard shots" at the time of the Anderson shooting and that he was not aware what was going on.  As to the Thompson shooting, the jury heard [Brown] say he was in the back of the wagon "rolling up some weed" when the shooting occurred, that he did not want the shooting to happen, and that he did not fire any shots. Furthermore, Sergeant Cruz, in asking [Brown] who was shooting, said first, "[L]et's go by the people in the car?  Was it Kevin?"  When [Brown] said it probably could have been Kevin, Cruz continued, in the redacted version, ". . . obviously when there's people with guns within a car, a small car, you're gonna be able to tell, I mean that's just real.  You're gonna be able to tell who's got a gun and who doesn't have a gun."  This exchange made clear that [Brown] and Kevin were not the only people in the car. While the jury did not hear all the exculpatory statements [Brown] made, the redactions to the statements did not distort their meaning.

(Ans., Ex. L at 35.)

Habeas relief is not warranted here.  The state appellate court reasonably determined that Brown's defense was not injured by the redactions, and that no due process violation occurred.  The jury heard the very information Brown believes crucial to his defense — that he did not know others in the car had guns and that he did not know there was going to be a shooting.  Nothing in the redactions erodes, diminishes, or distorts in any perceptible way this defense, nor has Brown shown such an effect.  The details he makes so much of, e.g., that the guns were left in the car after the Thompson shooting or that the others were talking about buying marijuana, are at best cumulative of other evidence presented at trial, and at worst irrelevant or trivial.  Therefore, this Court cannot say that the state appellate court's decision was unreasonable.  It is entitled to AEDPA deference.  This claim is DENIED.

## IV.    Admission of Evidence of an Uncharged Offense

As noted above, the prosecution presented evidence of the murder of Michael Thompson, who was shot and killed the same day as Anderson.  Brown admitted to police that he was in the car when a fellow passenger shot Thompson.  (Ans., Ex. L at 8.)  Brown claims that admission of this evidence was prejudicial and constituted improper character or propensity evidence.  The state appellate court rejected the claim on grounds

that the evidence was properly admitted to show identity.[2]  (*Id.* at 43.)

Habeas relief is not warranted here.  As stated earlier in this order, federal habeas relief is not available for the admission of character or propensity evidence, *Alberni*, 458 F.3d at 866–67, nor for the admission of irrelevant or overly prejudicial evidence, *Holley*, 568 F.3d at 1101.

Also, the admission of evidence is not subject to federal review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fair trial guaranteed by due process.  *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

Here, both killings happened on the same day, the same two guns were used in both, and Brown admitted that he was present when the shooting occurred.  From such evidence, the jury could draw permissible inferences regarding the identity of the perpetrators.  No due process violation occurred.

Because the state appellate court's rejection of petitioner's claim was reasonable, and therefore is entitled to AEDPA deference, this claim is DENIED.

## V.     Exclusion of Jurors

Brown claims that the prosecution's exclusion of three African–Americans from his jury violated the Equal Protection Clause.  The state appellate court summarized the facts as follows:

> Defense counsel raised no objection to the prosecutor's first excusal of an African–American juror, C.D.  The prosecutor excused three other African–American jurors, K.H., F.P, and A.C., and on each occasion, a motion was made under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).[3]  [Footnote omitted.]

[2] The appellate court concluded that it was error to admit this evidence against Robertson and Rubio, however.  That error, though, was found harmless.  (Ans., Ex. L at 43–44.)
[3] In California, a party who believes his opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may raise the point by way of a timely motion

United States District Court
Northern District of California

United States District Court
Northern District of California

At the hearing on the *Batson/Wheeler* motions, Delvond Brown's counsel argued that the prosecutor had systematically excluded African–American jurors.  K.H., he argued, was well-qualified and intelligent; F.P. was able to view the evidence in a balanced manner, and A.C. had worked within the system and had expressed her willingness to be fair and impartial.  Rowmond Brown argued that the prosecutor had shown a pattern of discrimination against educated [b]lack jurors.

The trial court found there was a reasonable inference that the prosecutor had exercised peremptory challenges based on race, sufficient to shift the burden to the prosecutor to justify his exercise of the challenges in a race-neutral fashion.

As to C.D., the prosecutor noted that she was 25 minutes late to court one morning, that she had her eyes closed or almost closed during most of the time the jurors were being questioned, that she did not consider her occupation as an airport security officer to be law enforcement, that her two sons had been arrested and prosecuted for criminal charges, that she had visited relatives in prison, and that she had at some point been a member of the NAACP, which the prosecutor characterized as an organization that was 'sympathetic to people who are charged with criminal offenses and have been coming through the criminal justice system, a system that they are actively trying to reform.'

K.H., the prosecutor pointed out, had lived for the past 30 years in Berkeley, which he said many people consider 'probably the most liberal city in the United States.'  K.H. was politically active in Berkeley, was a member of the Berkeley School Board, and had been a legislative aide for the City of Berkeley.  She was also City Clerk and Assistant to the City Manager of the City of Emeryville.  In response to a question about whether she had political aspirations, she had replied something to the effect of, 'Never say never.'  The prosecutor did not believe someone who was involved in Berkeley politics and who might have further political aspirations was likely to be a 'very good prosecution oriented juror.'  He was also concerned about K.H.'s membership in a number of organizations, including the National Women's Political Caucus; United In Action, which K.H. had characterized as an umbrella organization of 'organizations that [ ] either represent communities of color or other groups that are interested in improving [education],' and the NAACP, which the prosecutor characterized as 'actively tr[ying] to promote change and reform in the criminal justice system on behalf of its members and on behalf of people

under *People v. Wheeler*, 22 Cal.3d 258, 280 (1978).

who are [ ] African–American.'

As to F.P., the prosecutor expressed two concerns.  First, his brother was currently awaiting trial in a murder case.  Second, he had founded a program dedicated to 'getting kids off the street,' and when some of the youths had been arrested, he had visited them in jail to support them.

A.C., the prosecutor noted, had worked in the past for the State Public Defender, and had answered telephone calls from defendants.  She had worked for the Department of Fair Education and Housing, for the Department of Health Services, and as an adolescent group home counselor.  The prosecutor acknowledged that this work was admirable, but said that in his experience, people who did that sort of work tended to feel sympathy for people charged with crimes.  Moreover, A.C. had been arrested for purse snatching and placed on probation as a juvenile, and had on another occasion — which she did not mention in the jury questionnaire — been arrested by the Oakland Police Department and jailed.  He did not believe she would be favorable to the prosecution.

The prosecutor also noted that at the completion of jury selection, three of the 12 seated jurors were African–American.

In response, defense counsel pointed out that a white juror, juror number 13, who had been engaged in outreach work had not been excused, and that another juror who had been born in Berkeley had been seated on the jury without questions about her residency.  The prosecutor responded that he had concerns about whether juror number 13 would be a favorable prosecution juror, but that she was an alternate.  Furthermore, at the time juror number 13 was seated there were only 18 potential jurors remaining on the panel, and defendants had 13 challenges remaining; the prosecutor was concerned that defense counsel might excuse any remaining jurors who were more favorably disposed toward the prosecution.  As to A.C., he noted that race was likely to be a factor in the case, and A.C.'s work for Fair Employment and Housing included limited investigations into whether discrimination had occurred, leading him to think she would be more sympathetic to the defense than to the prosecution.  As for the seated juror who had been born in Berkeley, her juror questionnaire indicated she had lived in Hayward for 30 years, distinguishing her from K.H., who was not only a resident of Berkeley but was politically active there.

The trial court denied the *Batson/Wheeler* motions.  It noted that the prosecutor was obliged only to offer a genuine, reasonably specific, race- or group-neutral explanation of a suspect excusal, and that jurors may be excused based on trivial reasons or hunches, or even arbitrarily, so long as the decisions are not based on impermissible group bias. [Citations omitted.]

Although C.D. was not the subject of a *Batson/Wheeler* motion, the trial court discussed her exclusion as part of the totality of the circumstances. The court noted that she was nearly half an hour late on the first morning, and offered no excuse.  It also appeared to the court that she was dozing off throughout the jury selection process.  Moreover, her two sons had been arrested and prosecuted for drug offenses in Alameda County, then went to state prison.  She had also visited relatives in prison, including a former brother-in-law who had been jailed for robbery.

Discussing the exclusion of K.H., the trial court noted that even if it were based only on her Berkeley residence, that would be a race-neutral reason. However, in addition K.H. was 'intensely involved' in both Berkeley and Emeryville politics, which the court considered a race-neutral reason for exclusion.  Moreover, she was a member of organizations whose positions generally supported those charged with crimes, also a race-neutral reason in the court's estimation.

As to F.P., the trial court noted that his brother was awaiting trial for murder, and concluded that this factor alone would justify excluding him. The court also agreed that while F.P.'s work coaching children and supporting those who went to jail was commendable, it might cause him to have sympathy and empathy with defendants.

As to A.C., the court noted that she had worked for the State Public Defender, which was dedicated to defending those charged with crimes, and with other agencies that worked with defendants, which the prosecutor could fear would lead her to have sympathy with defendants; this alone, in the court's view, would justify excluding her.  Moreover, she had not only been arrested as a juvenile for purse snatching, but had also been arrested on another occasion — one she omitted from the jury questionnaire — by the Oakland Police Department, which had investigated the murder of Anderson and arrested defendants.  The court found these reasons race neutral.

The trial court also noted that the prosecutor had conducted similar voir dire for all jurors, that the jury as seated included three African–Americans, and that the prosecutor had three times 'passed' his peremptory challenge when the jury contained three African–Americans.  The court also found the jurors to whom defense counsel had compared the excused jurors were not similarly situated.  The court concluded that the prosecutor was truthful about the reasons for exercising his peremptory challenges, and denied the *Batson/Wheeler* motions.

(Ans., Ex. L at 13–17.)

United States District Court
Northern District of California

13

United States District Court
Northern District of California

The state appellate court rejected Brown's Equal Protection claim on grounds that the record supported the trial court's determination that the prosecutor's reasons for his exclusions were credible, legitimate, and non-discriminatory:

> The record supports the trial court's decision. K.H.'s background, including her status as an elected member of Berkeley's school board, could reasonably lead the prosecutor to believe her views might not be favorable to the prosecution. Defendants do not contend that residence in Berkeley, and involvement in the politics of that city, are a proxy for race, and nothing we are aware of would support such an assumption. (Compare *United States v. Bishop* (9th Cir. 1992) 959 F.2d 820, 822, 825–826, overruled on another ground in *United States v. Nevils* (9th Cir. 2010) 598 F.3d 1158, 1167 [improper to base challenge on juror's residence in city heavily populated by low-income African–Americans rather than on juror's own attitudes].) The trial court could properly conclude the prosecutor's proffered race-neutral reasons for excusing K.H. were genuine.
>
> We recognize that one of the reasons the prosecutor gave for excusing K.H. was her membership in the NAACP, among other organizations, a reason he had also given for excusing C.D., who had been a member of the NAACP for a short period in the 1970s. FN20[.] The expressed basis for his concern, however — his belief that the NAACP actively tried to promote reform in the criminal justice system and that its members might not be favorably disposed toward the prosecution in a criminal case — was not inherently connected to the race of the prospective juror, and was not implausible. [Footnote and citation omitted.] Furthermore, the other reasons he proffered — that she was politically active in a liberal city, that she was a public official, and that she had not ruled out further political aspirations — were race neutral and plausible.
>
> FN20. The prosecutor's challenge of C.D. was not the subject of a Batson/Wheeler motion, although the trial court considered it as part of the totality of the circumstances. Her lateness, inattentiveness in court, and the criminal record of at least three members of her family provided ample race-neutral justification for excusing her.
>
> The fact that the prosecutor did not challenge two other African–American jurors who were members of the NAACP does not change our view. One of the two had worked in security management after retiring from the Navy, and was a member of a neighborhood watch group. Although he had a son who had been briefly jailed 15 or 16 years previously, the prosecutor could reasonably have concluded from his background in the military, his work in security, and his involvement in neighborhood watch, that he was likely to

14

United States District Court
Northern District of California

be a favorable juror. [Citation omitted.] The other juror who was a member of the NAACP was a nurse who had worked with trauma victims, and had seen a lot of violence in her career. Asked her opinion of the criminal justice system, she stated that it was a "hard task," noted Oakland's high murder rate, and said that she thought the system treated people fairly. The prosecutor could reasonably have concluded that her background as a whole did not suggest she would favor defendants. Thus, a comparison of these jurors with K.H. and C.D. shows they are not similarly situated. [Citation omitted.]

The trial court could similarly accept the prosecutor's expressed reasons for excusing F.P., whose brother was awaiting trial in a murder case. "The arrest of a juror or a close relative is an accepted race-neutral reason for exclusion." [Citation omitted.] Nor was it unreasonable for the trial court to accept at face value the prosecutor's expression of concern that F.P .'s work with young people who had been jailed might lead him to sympathize with defendants in a criminal case. These reasons, too, were race neutral.

Defendants contend the prosecutor's concern with the fact that F.P.'s brother was awaiting for trial for murder was a sham, pointing out that the prosecutor did not challenge a white juror who had checked the "yes" box to the question, "Have you or a close friend or relative ever been accused of, arrested for or prosecuted for a crime?" The questionnaire contained no elaboration of this answer, and the prosecutor did not ask the juror any questions about it. Assuming this omission was deliberate and not an oversight, this juror had worked as a police technician for years. As part of her responsibilities, she had worked in booking and as a dispatcher. This background as a whole might reasonably be seen to suggest the juror would be favorably disposed toward the prosecution. A comparison of this juror with F.P. shows they are not similarly situated, and there is no basis to conclude that the prosecutor's stated reasons for excusing F.P. were a sham.

A.C., as the prosecutor pointed out, had not only been placed on probation as a juvenile for purse snatching, but had neglected to mention on her jury questionnaire that on another occasion she had also been arrested by the Oakland Police Department and jailed. Her own experience with being arrested and incarcerated, including an arrest by the same police department that investigated the crimes in question here, was a race-neutral reason for exclusion that the court could reasonably accept. Likewise, the court could accept the prosecutor's explanation that he was concerned that A.C.'s work for the State Public Defender might indicate she would not be favorable to the prosecution.

. . . .

Thus, we conclude the record contains substantial evidence to support the

trial court's conclusion that defendants did not prove purposeful discrimination. [Citation omitted.]

(Ans., Ex. L at 18–21.)

The Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986). *Batson* permits prompt rulings on objections to peremptory challenges pursuant to a three-step process. First, the defendant must make out a prima facie case that the prosecutor has exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93–94. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000). Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195. A federal habeas court need not dwell on the first step of the *Batson* analysis if the matter has proceeded to the second or third step. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

In evaluating an explanation of racial neutrality, the Court must keep in mind that a proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause, *see Hernandez*, 500 U.S. at 355–62, and that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility, *Rice v. Collins*, 546 U.S. 333, 340–42 (2006). To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility in light of the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel. *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004). A legitimate reason "is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v.*

*Elem*, 514 U.S. 765, 769 (1995). What matters is the "genuineness of the motive" behind the racially-neutral explanation, not "the reasonableness of the asserted nonracial motive." *Id.* "To accept a prosecutor's stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (internal quotation marks and citation omitted).

AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks and citations omitted). More specifically, the findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, *see Elem*, 514 U.S. at 769, as are the findings of the state appellate court, *see Mitleider*, 391 F.3d at 1050; *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means that a state court's findings of discriminatory intent are presumed sound unless a petitioner rebuts the presumption by clear and convincing evidence. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). "[W]e must defer to the [California Court of Appeal's] conclusion that there was no discrimination unless that finding was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Cook v. LaMarque*, 593 F.3d 810, 816 (9th Cir. 2010) (internal quotation marks and citation omitted). A federal habeas court may grant habeas relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338–41.

Applying these legal principles to the instant matter, the Court concludes that Brown has not rebutted the presumption that the state court's conclusion was a reasonable one, *see Miller-El*, 545 U.S. at 240, as the following analysis shows. The Court need not dwell on the first step of the *Batson* analysis, whether Brown made a prima facie case, because (a) the prosecutor offered racially-neutral explanations for striking the jurors, and

1    (b) the trial court ruled on the ultimate question of intentional discrimination.

2         With respect to the second *Batson* step, the record does not support Brown's

3    assertion that the prosecutor's decisions were based on constitutionally offensive

4    considerations.  As the state appellate court reasonably found, the prosecutor's stated

5    legitimate, non-discriminatory reasons for the peremptory challenges against K.H., F.P.

6    and A.C. were supported by the record.  The record shows that K.H. had strong political

7    beliefs, as evidenced by her long-term involvement in Berkeley politics and her

8    associations with several political and social-reform organizations such as the NAACP.

9    Evidence of strong political beliefs could lead a prosecutor to think that K.H. may be

10   biased, and therefore unable to adhere to a juror's oath to be fair and impartial.  Striking a

11   juror for membership in an advocacy group does not, by itself, demonstrate a *Batson*

12   violation.  *See United States v. Payne*, 962 F.2d 1228, 1233 (6th Cir. 1992).

13        Similarly, evidence that a prospective juror's close family member was facing trial

14   could lead a prosecutor to reasonably believe that the prospective juror may well be biased

15   against the courts or law enforcement.  The record shows that F.P.'s brother, with whom

16   F.P. stated he had a good relationship and to whom he was close (Ans., Ex. B, Vol. 4 at

17   381), was awaiting trial for murder and worked with children who had been arrested, even

18   visiting them in jail.

19        A.C. had worked for a public defender and had herself been arrested and spent time

20   in jail and on probation.  She had been arrested and jailed by the same police department

21   that investigated the Anderson and Thompson killings.  (*Id.* at 617.)  Evidence that a

22   prospective juror had a negative history with law enforcement, both personally and

23   professionally, could lead a prosecutor to reasonably believe that such person might well

24   be biased against the courts or law enforcement.

25        The third *Batson* step involves a query whether there was intentional discrimination.

26   Here, petitioner Brown has not shown clear and convincing evidence to rebut the

27   presumption that the trial court's determination was correct, or shown why this Court

28   should favor Brown's interpretation of the record over the trial court's credibility

United States District Court
Northern District of California

18

1    determination.

2         A comparative juror analysis, which was conducted by the state appellate court in

3    its review of petitioner's claims, further supports this conclusion.  The record supports the

4    state appellate court's conclusions that the seated jurors were not in truth similarly situated

5    to the excluded ones.  Juror 13 had "done outreach work," but there was no evidence that

6    Juror 13 had, unlike A.C. and F.P., a negative history with law enforcement.  Also, Juror

7    13, who was a health-care policy research analyst, performed social work of a different

8    sort.  She was involved with community health care, e.g., helping people complete medical

9    insurance forms and performing dental and vision screening for children.  (Ans., Ex. B,

10   Vol. 5 at 824, 827.)  The seated juror who had been born in Berkeley was not similarly

11   situated to K.H.  That juror lived in Hayward, and there was no evidence that she had

12   strong political views and heavy involvement in political and social reform movements.

13   Also, this juror's son worked as a correctional officer for both the San Leandro Police

14   Department and the Oakland jail.  (*Id.*, Vol. 4 at 396.)  The record also supports the

15   determination that seated jurors who, like K.H., were members of the NAACP, were not

16   similarly situated.  One of these jurors had been in the military, "worked in security," and

17   was part of a neighborhood crime watch group.  These factors, unpossessed by K.H.,

18   would counter the unease the prosecutor may have felt about the juror's membership in a

19   political and social reform organization.  The other juror's first-hand experience of victims

20   of violence, her concern over murder rates, and her stated belief that the system treats

21   people fairly are factors that distinguish this juror from K.H. and relate directly to a

22   prosecutor's concerns about bias against the criminal justice system.

23        The record also shows differences between F.P. and the seated white juror who had

24   said "yes" to the question whether a close friend or relative had a negative history with law

25   enforcement.  The seated juror had worked in law enforcement as a police technician, a

26   fact that places this juror in a different light than F.P., and bears directly on the issue of

27   bias.

28        The state appellate court's determination is also bolstered by the circumstances

19

surrounding C.D.'s exclusion.  C.D., whose exclusion was not the subject of a defense objection, (1) had been late to court and appeared to not pay attention to the proceedings; (2) had two sons who had been arrested, prosecuted, and convicted of criminal offenses in the same county as the Anderson killing, and had a brother-in-law who had been jailed for robbery; and (3) was a member of the NAACP at one time.  (Ans., Ex. A, Vol. 10 at 362; Ex. B, Vol. 1 at 161-62.)  These facts are consistent with the prosecutor's reasons for the other exclusions:  a negative history with law enforcement, indications that she could not discharge her duties as a juror (e.g., sleepiness and lateness), and an association with a political organization — all of these without some counterbalancing factor such as those possessed by the seated jurors.

Taking all this into account, the Court concludes that petitioner Brown has not shown that his constitutional rights were violated, or that the state appellate court's decision was anything other than "plainly not unreasonable."  *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011).  At a minimum, Brown's claim must be denied because he has failed to show that there was "no reasonable basis for the state court to deny relief," *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011), that is, he has not shown that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, *see* 28 U.S.C. § 2254(d).  Accordingly, this claim is DENIED.

## VI.    Prosecutorial Misconduct Claim

Brown claims that the prosecutor knowingly presented false testimony.  At trial, prosecution witness Jeffrey Bunn testified under a grant of immunity:

> During his testimony, he said on multiple occasions that he believed his grant of immunity covered perjury he committed while testifying, although he later stated that he did not believe this was the case.  He acknowledged, however, having committed numerous acts of perjury during the course of his trial testimony.  During cross-examination, this exchange occurred:  "Q. You have no concern about lying under oath do you?  [¶]  A.  No.  [¶]  Q. None whatsoever?  [¶]  A.  Nope."  FN30[.]

20

FN30. Bunn testified over the course of three days, and both the second and third days of his testimony expressed his view that he had immunity for lies he told at trial. After a recess on the final day of his testimony, he testified that he did not think he was immune for perjury committed at trial. Defense counsel then asked Bunn whether he had spoken with the prosecutor between the time he testified on the previous day and when he came back to testify on the third day, and Bunn said he had not done so. Bunn also denied having spoken with the prosecutor about his testimony at any point after he left the stand on the second day of his testimony. The prosecutor later told the court that during morning recess that day he had spoken with Bunn about the importance of telling the truth, that he had asked Bunn if he was willing to testify that he knew the defendants, and that Bunn had said he would do so.

(Ans., Ex. L at 49–50.) The state appellate court rejected Brown's claim. Not only did the prosecutor correct Bunn's misapprehension that his immunity protected him from the consequences of committing perjury, the jury was made aware of his "numerous instances of lying and perjury." (*Id.* at 50.)

When a prosecutor obtains a conviction by the use of testimony which he knows or should know is perjured, such conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury. *United States v. Agurs*, 427 U.S. 97, 103 (1976). To prevail on such a claim a "petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003).

Habeas relief is not warranted here. Brown has not shown that the prosecutor knew initially that the testimony was false. Rather, the record shows that when the prosecutor discovered that Bunn may have been untruthful, he instructed Bunn to tell the truth and asked him whether he could testify truthfully. On such a record, there is no indication that the prosecutor knowingly presented false testimony, or otherwise committed misconduct.

Nor is habeas relief warranted on his related claim that the trial court should have stricken Bunn's testimony. As the state appellate court noted, the jury was aware of Bunn's lack of truthfulness and could evaluate the believability of his testimony

United States District Court
Northern District of California

1    accordingly.  The state appellate court's rejection of this claim was reasonable, and is

2    therefore entitled to AEDPA deference.  Accordingly, the claim is DENIED.

3    **VII.    Trial Court's Response to a Jury Question**

4           Brown claims without elaboration that the trial court violated his right to due

5    process by failing to adequately respond to a jury question.  During deliberations, the jury

6    asked the trial court "to explain in layman's terms the meaning of 'evidence of other

7    crimes by a defendant proved by a preponderance of evidence.'"  (Ans., Ex. L. at 45.)  The

8    trial court discussed the matter with counsel outside the jury's presence:

> The prosecutor noted that after the jury made its enquiry the previous day,
> the trial court had told counsel it would not give a layman's definition and
> that it would instead give the jury the CALJIC instructions it had already
> received, and that no counsel had raised an objection.   Counsel for
> Rowmond Brown confirmed that all counsel had approved of the court's
> proposal.  The prosecutor went on to recommend returning the jury to the
> courtroom to instruct it pursuant to CALCRIM No. 375 ["Evidence of
> Uncharged Offense to Prove Identity, Intent, Common Plan, etc."].   All
> four defense counsel objected to reading the CALCRIM instruction to the
> jury at that point.

16   (*Id.* at 45–46.)  The trial court told the jury that it could not provide a layman's definition

17   because the jury instructions "contain words of particular legal significance which I'm not

18   permitted to amplify upon or deviate from."  (*Id.*, Ex. B, Vol. 30 at 6501.)  The trial court

19   directed the jurors' attention back to the instructions, and reread to them the instructions on

20   (a) evidence of other crimes (CALJIC No. 2.50), (b) evidence of other crimes proved by a

21   preponderance of the evidence (CALJIC No. 2.50.1), and (c) the definition of the

22   preponderance of the evidence (CALJIC No. 2.50.2).  The foreperson then asked the trial

23   court whether it could provide an example [of the preponderance standard?].  The trial

24   court said it could not.  The foreperson said, "I tried."  (*Id.* at 6504.)

25          A trial judge has wide discretion in charging the jury, a discretion which carries

26   over to the judge's response to a question from the jury.  *Arizona v. Johnson*, 351 F.3d

27   988, 994 (9th Cir. 2003).

28          Habeas relief is not warranted here.  First, this claim was waived because defense

counsel raised no objection at trial.  Second, Brown has not shown how he was prejudiced by the trial court's response.  One can reasonably infer that the jury found by at least a preponderance of the evidence that Brown was involved in the Thompson shooting — he admitted being present.  Brown therefore has not shown that there was no reasonable basis for the state courts to deny relief.  Accordingly, this claim is DENIED.

## CONCLUSION

The state court's adjudication of Brown's claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law, nor did they result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, the petition is DENIED.

A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

**Dated:**  August 18, 2014

WILLIAM H. ORRICK
United States District Judge